**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Louis C. Squires, III, | ) | |
| | ) | Case No. 3:08CV00154 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Commissioner of Social Security, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423.  Pending are the briefs of the parties and Plaintiff's Reply (Docket Nos. 18, 23, 24).  For the reasons set forth below, the Commissioner's decision is affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on February 18, 2003, alleging disability since September 7, 2001 (Tr. 65-67).  Plaintiff's application was denied initially and upon reconsideration (Tr. 33-36, 38-40).  On January 6, 2006, a hearing was held on this matter before Administrative Law Judge (ALJ) John Pope.  Plaintiff, represented by counsel, and Vocational Expert (VE), Joe Havranek, appeared and

testified (Tr. 372).  The ALJ issued an unfavorable decision on July 24, 2006 (Tr. 17-25).  The Appeals Council affirmed the ALJ's decision thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 15-16).

## FACTUAL BACKGROUND

At the time of hearing, Plaintiff was 30 years of age, he weighed 225 pounds and he was 6'2" tall (Tr. 378).  Plaintiff was married and had three minor children (Tr. 378).  Plaintiff completed the twelfth grade and had additional vocational training in masonry (Tr. 379).  He was last employed in machine technology as a grinder/leader.  Previously,  he worked in construction installing dry wall and carpeting (Tr. 380).  Four years prior to the hearing, Dr. Bauer recommended that Plaintiff refrain from working (Tr.  387).  Plaintiff did not have psychological impairment that impeded his ability to work (Tr. 392).

Plaintiff had permanent shoulder injuries, migraine headaches, thoracic outlet syndrome and seizures (Tr. 381, 387, 395, 397).  The headaches occurred daily and were of the severity to incapacitate him for up to twelve hours (Tr. 395).  The symptoms associated with thoracic outlet syndrome included a sharp, dull, aching, burning and stabbing pain, numbness in both arms, his legs, back, neck and head and muscle spasms (Tr. 381, 382, 392, 393).  His feet fell asleep "all the time" and they hurt "all of the time."  Plaintiff walked with a cane (Tr. 397).  Plaintiff's physician had not determined why Plaintiff's knees dislocated from the socket (Tr. 383).

Plaintiff could only stand for approximately fifteen minutes and he could not walk for extended periods of time.  Plaintiff could lift no more than five pounds (Tr. 383, 393).  Sitting was limited to, at most, twenty minutes before his neck swelled or pain developed in his shoulder, neck, back or legs (Tr.

2

383, 396).  He estimated that if he drove for approximately forty-five minutes, he would be in pain one half hour of that time (Tr. 396).  Plaintiff had a loss of mobility in both hands (Tr. 397).

Three to four times annually, Plaintiff saw Dr. Bauer for maintenance of drug therapy and Dr. Abu Chopra for pain management (Tr. 384-385).  The drug therapy included prescriptions for a muscle relaxer, pain reliever and sleep aid.  The medication made him drowsy for four to five hours (Tr. 388).

During a typical day, Plaintiff arose "around nine," ate breakfast, sat on the couch, stood and walked around, ate lunch, returned to the couch, read to his daughter, drove her to school, picked her up after school, returned to the couch until dinner was served (389, 390).  Occasionally, Plaintiff prepared dinner, dusted, washed dishes and vacuumed (Tr. 390).  After dinner, he returned to the couch to watch television.  He retired "around nine, ten o'clock."  Plaintiff was able to bathe and groom himself (Tr. 391).

The VE was asked to consider a hypothetical plaintiff with characteristics similar to Plaintiff, limited to lifting and carrying, occasionally, twenty pounds, ten pounds frequently, sitting, standing and walking six hours in an eight-hour workday but limited to only occasional reaching overhead with the left upper extremity.  The hypothetical plaintiff could perform work as a collator operator, injection molding machine tender and traffic flagger (Tr. 400).  Within a 75 mile radius of Toledo, Ohio, there would be approximately 400-500 operator jobs, 600-750 tender jobs and 200-250 flagger jobs (Tr. 400).  Assuming that Plaintiff's testimony was totally credible, there would be no jobs that he could perform (Tr. 401).

## MEDICAL EVIDENCE

In early September 2001, Plaintiff fell while moving a mattress, dislocating his shoulder blade.  He was prescribed Tylenol #3 for pain (Tr. 217).  During the next week, the pain, discomfort and

3

numbness dissipated.  Suddenly on September 17, 2001, Plaintiff was in severe pain again (Tr. 216).

On September 22, 2001, X-rays of Plaintiff's left shoulder showed evidence of tendinous strain or

partial thickness tear and mild shoulder impingement.  The results from X-rays of Plaintiff's left

shoulder were negative for acute fracture, dislocation or incomplete or partial dislocation (Tr. 221).

Dr. Mary Joyce Matthews conducted an electrodiagnostic consultation on September 29, 2001,

finding mild neuropathic involvement of the left brachial plexus at the junction of the C5-C6 roots (Tr.

176).  Plaintiff was prescribed orthopedic support for his shoulder on October 2, 2001 (Tr. 213).

On November 12, 2001, Plaintiff commenced treatment with Dr. George Stephanic, a Doctor

of Osteopathic Medicine (D.O.) (Tr. 227).  Dr. Stephanic confirmed that Plaintiff did not have a rotator

cuff tear and left neuropathy brachial plexus (Tr. 228, 231).  Dr. Stephanic attributed Plaintiff's pain

to a nervous system disorder that resulted in chronic and burning pain (Tr. 228).

Dr. David A. Wassil, D.O., treated Plaintiff for left sided brachial plexus strain injury on

December 11, 2001 (Tr. 209).

Plaintiff was examined by Dr. William R. Bauer, a board-certified neurologist, on December 28,

2001.  Dr. Bauer confirmed that Plaintiff's shoulder was dislocated (Tr. 279).

Dr. Wassil prescribed Oxycontin to relieve persistent shoulder pain on January 11, 2002 (Tr.

207).  Dr. Bernardo D. Martinez diagnosed Plaintiff with thoracoscapular dissociation syndrome on

April 30 and March 12, 2002 (Tr. 148, 151).

On September 19, 2002, Plaintiff underwent thoracic outlet decompressive surgery (Tr. 142,

154-166).  Plaintiff presented with numbness, tingling, shoulder and arm pain, burning and

hypersensitivity of his left arm secondary to thoracic outlet surgery.  Medication suitable for treating

pain and gastritis were prescribed (Tr. 204).  Plaintiff had improved from the venous and neurogenic compression two months post surgery (Tr. 140).

On October 5, 2001, Plaintiff was admitted to physical therapy for purposes of increasing range of motion, strength and activity at the shoulder while decreasing discomfort (Tr. 241).  Plaintiff participated in one session of treatment, reporting a decrease in pain (Tr. 246).

Plaintiff was evaluated on November 5, 2002 for physical therapy.  He was discharged from therapy on December 26, 2002 because he had two or more cancellations (Tr. 177).

Plaintiff was treated on an emergency basis for chest discomfort on January 31, 2003.  The electrocardiogram was normal (Tr. 202).  On January 31, 2003, Plaintiff was diagnosed with chest wall pain.  A pain reliever was administered intramuscularly (Tr. 234).

In February 2003, Plaintiff was prescribed a pain patch as he had pain in the first rib region (Tr. 197).  The side effects included onset dizziness, lightheadedness, nausea and gastrointestinal upset (Tr. 200).

On March 20, 2003, Plaintiff underwent several radiological tests for diagnostic purposes.  The results from the venogram were predominantly unremarkable (Tr. 169).  There was no acute pulmonary abnormality identified from the chest X-rays (Tr. 167).  X-rays from the mid cervical region showed the presence of very minimal bone spurs (Tr. 170).  Mild degenerative arthritis with no significant abnormality was present in the cervical spine (Tr. 171).

On March 24, 2003, Dr. Bauer observed that the prescribed medications-Duragesic patch, Prilosec and Trileptal–were helping with the management of Plaintiff's day-to-day aches and pains (Tr. 275, 276).

On March 27, 2003, Dr. Eli N. Perencevich, D. O., determined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and push and/or pull limited in the upper extremities (Tr. 265).  The only manipulative limitation noted was in the ability to reach in all directions.  Otherwise, no postural, visual, communicative or environmental limitations were imposed (Tr. 266-267).

Plaintiff complained that his pain was worsening on May 5, 2003; consequently,  Dr. Bauer increased the absorption rate on his Duragesic patch (Tr. 274).  In June 2003, Dr. Bauer referred Plaintiff to a pain management clinic and increased medication typically prescribed for seizures (Tr. 272, 291).  Although Plaintiff had a block of his left upper extremity and shoulder, he continued to have pain.  On August 11, 2003,  the combination of drugs previously prescribed for pain and seizures was continued (Tr. 290).  In September 2003, the pain patch was replaced with Vioxx® (Tr. 289).

In July 2003, Dr. Kiran Chary Tamirisa began a series of injections in Plaintiff's left shoulder joint (Tr. 346-347).  Dr. Tamirisa administered one injection in August 2003, (Tr. 343-344), two in November 2003 (Tr. 335-336, 339-340) and one in December 2003 (Tr. 333-334).

On August 15, 2003, Dr. Wassil prescribed a two-week supply of medication designed to manage acid reflux (Tr. 325).  Plaintiff continued to have left arm pain so Dr. Wassil adjusted his medication in October 2003 to include extended release pain medication and a non-steroidal anti-inflammatory medication (Tr. 324).

In August 2004, Plaintiff was treated for episodic headaches and sleep disturbance (Tr. 288, 298).  Dr. Bauer prescribed medication designed to prevent migraines (Tr. 288).  The magnetic resonance imaging (MRI) of the head did not reveal any intracranial mass lesions or structural

abnormalities.   Dr. Iman Abou-Chakra prescribed medication to restore the sleep-wake cycle as Plaintiff's chronic pain was responding to physical therapy but disturbing Plaintiff's ability to sleep (Tr. 298).

On August 4, 2004, Dr. David E. Szymanski conducted a needle examination of Plaintiff's right arm, finding a lack of ulnar response visible in the setting of thoracic outlet syndrome.  He did find ulnar response consistent with left-hand numbness or moderate left-sided carpal tunnel syndrome (Tr. 319).

An electromyograph (EMG)  administered sometime after October 21, 2004, showed evidence of a proximal brachial plexus lesion between the armpit and side of the neck (Tr. 286, 287).   On December 16, 2004, Dr. Abou-Chakra increased the dose frequency of the seizure medication (Tr. 294).

Plaintiff was evaluated at the Cleveland Clinic in December 2004.  No clear source of Plaintiff's neuropathic problems was identified (Tr. 313).  Dr. Amanda Reddy noted that spinal surgery was not  indicated (Tr. 330).

After physical therapy and epidural injections failed to provide pain relief, Dr. Bauer referred Plaintiff for a neurological consultation on February 18, 2005 (Tr. 283).  Later on May 16, 2005, Dr. Bauer increased the "migraine prevention" medication (Tr. 282).

Dr. Wassil noted on June 20, 2005 that the results from tests measuring Plaintiff's pulmonary function and levels of immoglobulin were not remarkable (Tr. 308).  Dr. Bauer increased the dosage of the "migraine prevention" medication again and referred Plaintiff to the pain management clinic on July 18, 2005 (Tr. 281).

On July 19, 2005, Dr. Wassil found that Plaintiff was no longer out of breath and his blood pressure was within a normal range (Tr. 307).

7

Dr. Bauer opined that the results from the electroencephalogram administered on or about September 24, 2006, were abnormal.  In fact, the results were consistent with focal epilepsy or temporal lobe epilepsy (Tr. 370).  There was no evidence of underlying generalized seizure disorder or cardiac arrhythmia (Tr. 371).

## STANDARD FOR DISABILITY

To establish entitlement to disability benefits, a claimant must prove that he or she is incapable of doing substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a period of twelve months or results in death.  *Murphy v. Secretary of Health and Human Services*, 801 F. 2d 182, 185 (6th Cir. 1986) (*citing* 42 U. S. C. § 423(d)(1)(A) (1986)).  The claimant must show that his or her impairment results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques derived from acceptable medical sources.  20 C.F.R. §§ 404.1513, 404.1528 (2002).

To determine disability, the ALJ uses a five-step sequential evaluation process.  During the first four steps, the claimant has the burden of proof.  *Walters v. Commissioner of Social Security*, 127 F. 3d 525, 529 (6th Cir. 1997) (*citing Young v. Secretary of Health and Human Services*, 925 F.2d 146, 148 (6th Cir. 1990); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987)).  This burden shifts to the Commissioner only at Step Five.  *Id.*

8

The ALJ considers:  (1) whether claimant is working; (2) whether claimant has a severe impairment; (3) whether claimant's impairment(s) meets or equals a listed impairment in Appendix 1 of Subpart P of Part 404, Listing of Impairments; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work.  20 C.F.R. § 1520(a)-(f) (Thomson Reuters/West 2008).

If the claimant is working or has no impairment or combination of impairments which significantly limit physical or mental abilities, a finding that the claimant is not disabled will ensue despite medical condition, age, education, and work experience.  However, when an impairment meets the durational requirement and meets or equals a listed impairment in Appendix 1, a determination of disabled will issue without consideration of age, education or work experience.  If a decision cannot be made based on current work activity or on medical facts alone, and a severe impairment(s) exists, the ALJ must review the claimant's residual functional capacity and the physical and mental demands of past relevant work.  If the claimant can still do this kind of work, the ALJ will find the claimant not disabled.  If the claimant cannot do any past relevant work because of the impairment, further consideration of the claimant's residual functional capacity, age, education and past work experience is explored to determine if the claimant can do other work.  If the claimant cannot do other work, the ALJ must find the claimant disabled.

## ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1.      Plaintiff met the insured status requirements of the Act through June 30, 2007.

2.      Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision.

3.      Plaintiff had the following severe impairment:  thoracic outlet syndrome-post surgery.

9

4.    Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalence of a listed impairment in 20 C. F. R. Part 404, Subpart P, Appendix 1 (Tr. 20).

5.    Plaintiff had the residual functional capacity to lift/carry 20 pounds occasionally and ten pounds frequently; Plaintiff was able to stand/walk for six hours out of an eight-hour workday; Plaintiff was able to sit for six hours out of an eight-hour workday; and Plaintiff could occasionally reach including overhead with the left upper extremity.

6.    Plaintiff was unable to perform any past relevant work; however, considering his age, education, work experience and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform.

7.    Plaintiff had not been under a disability as defined in the Act from September 7, 2001 through the date of this decision.

(Tr. 17-25).

## STANDARD OF REVIEW

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id*. (*citing Richardson v. Perales,* 91 S.Ct. 1420, 1427 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id*. (*citing Kirk v. Secretary of Health and Human Services*, 667 F. 2d 524, 535, (6th Cir. 1981) *cert. denied*, 103 S.Ct. 2428 (1983)).  The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole.  *Id*. (*citing Kirk,* 667 F. 2d at 536).  If the Commissioner's decision is

10

supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently. *See Kinsella v. Schweiker*, 708 F. 2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F. 2d 535, 545 (6th Cir. 1986) (en banc).

## DISCUSSION

Plaintiff seeks reversal and/or remand of the Commissioner's final decision claiming that the ALJ improperly (1) rejected the opinion of Dr. Bauer and (2) discredited his testimony.

**1.     The ALJ Improperly Rejected the Opinion of Dr. Bauer.**

Plaintiff concedes that Dr. Bauer's opinions are based in large part on subjective complaints; however, he argues that the ALJ did not apply the procedures established for not according controlling weight to an opinion of a treating source.

Generally the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security,* 502 F.3d 532, 540 (6th Cir. 2007) (*see Walters, supra*, 127 F.3d at 529-530 (*citing* 20 C.F.R. § 404.1527(d)(2) (1997)). A physician is considered a treating source if the claimant sees the physician with a frequency that is consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. *Id*. at 540 (alteration in original) (*quoting* 20 C.F.R. § 404.1502). A treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Farmer v. Astrue,* 2008 WL 343254, 6 (S. D. Ohio 2008) (*citing Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986)). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable

11

clinical and laboratory techniques and it is consistent with the other substantial evidence in the record. *Id.* (*citing Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994)).

If the opinion of a treating source is not accorded controlling weight, an ALJ must apply a host of factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion. *Wilson v. Commissioner of Social Security,* 378 F. 3d 541, 544 (6th Cir. 2004) (*citing 20 C. F. R.* § 404.1527(d)(2)). In summary, to apply the correct legal standards, the ALJ's decision to reject the treating physician's opinion must be based on good and specific reasons why the treating physician rule is inapplicable. *Id.*

Although the ALJ's explanation is readily identifiable in the discussion, interspersed throughout are explanations of why he did not give controlling weight to Dr. Bauer's opinions. The ALJ concurred in Plaintiff's assertion that Dr. Bauer was a treating physician (Tr. 19). The ALJ explained the nature and extent of the treating relationship (Tr. 19, 20). He mentioned the limited clinical and diagnostic testing administered under Dr. Bauer's direction (Tr. 20). The ALJ also discussed the inconsistencies between Dr. Bauer's opinions and those opinions from other medical sources (Tr. 22-24). The Magistrate affirms the ALJ's decision to reject Dr. Bauer's decision as he applied the correct legal standards, giving good and specific reasons why the treating physician rule is inapplicable to evidence presented by Dr. Bauer.

**2.     The ALJ improperly discredited Plaintiff's testimony about his subjective symptoms**.

Plaintiff claims that the ALJ improperly discredited his testimony about his subjective symptoms in five instances. First, the record does not support the ALJ's decision that his testimony about hobbies

12

is inconsistent with the function report. Second, the ALJ erred in finding that Plaintiff's decision to go on vacation was inconsistent with the allegations of pain. Third, the ALJ erred in finding that Plaintiff exaggerated his back and leg pain. Fourth, the ALJ erred in discounting his testimony because one of the physicians found his symptoms were psychosomatic. Fifth, the ALJ did not explain why the diagnostic tests and treatment notes are inconsistent with severe limitations. Plaintiff argues that consideration of these five factors resulted in a questionable credibility finding.

The ALJ, not the reviewing court, evaluates the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007) (*citing Walters, supra*, 127 F. 3d at 532; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk, supra*, 667 F. 2d at 538). The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* SOC. SEC. RUL. 96-7p, 1996 WL 374186, at * 4). Rather, the credibility determinations must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.*

Plaintiff's first claim that the ALJ erred in finding that his testimony that he engaged in no hobbies or activities since his injury was inconsistent with his Function Report. The Magistrate finds that the ALJ's finding is supported by the evidence in the record.

13

During direct examination by the ALJ, Plaintiff claimed that he used to have hobbies he enjoyed doing (Tr. 392).  His function report showed that even after his injury in September 2001, Plaintiff's interests included fishing, boating and riding a bike.  He fished sometimes twice a month if he felt good (Tr. 111).  Plaintiff's testimony denying that he had hobbies was not consistent with his claim that he sometimes fished twice monthly.  The ALJ could consider this testimony as other relevant evidence contained in the record.

With respect to Plaintiff's second claim, the Magistrate finds that it was appropriate for the ALJ to consider a request to postpone a scheduled hearing so that Plaintiff could go on vacation.  Such request, based on tangible evidence in the record, reflected on the intensity and persistence of Plaintiff's impairment (Tr. 50).  The ALJ did not err in considering all of the evidence in assessing Plaintiff's credibility.

In his third claim, Plaintiff contends that the ALJ found, improperly, that he exaggerated his leg and back pain based on the report of the Cleveland Clinic.  Plaintiff argues that the ALJ failed to explain what findings in the report indicate exaggeration and why he found them less than credible.

Albeit succinct, the ALJ did explain that Plaintiff's back and leg pain appear to be exaggerated based on the report of the examining specialist at the Cleveland Clinic.  Specifically, he found that Plaintiff underwent an evaluation on December 10, 2004, which found no clear sources of peripheral neuropathic problems, his evaluation was stable and no real new findings were made (Tr. 20).  This evidence, too, was indicative that Plaintiff's assertions of severe pain were incredible.

Addressing the fourth claim, Plaintiff argues that the ALJ improperly discounted his complaints of pain because his treating physician found that some of his symptoms were psychosomatic (Tr. 23).

14

The Magistrate does not disturb the ALJ's finding since the ALJ was free to consider the etiology of Plaintiff's impairment in assessing credibility provided it was supported by medical evidence.

Finally, Plaintiff testified that he had severe pain and daily migraines that lasted up to twelve hours.  Plaintiff argues that the ALJ does not explain why the diagnostic and treatment notes are inconsistent with his assessment of these severe limitations.  The Magistrate finds that the ALJ did explain that Plaintiff's symptoms could be expected to produce the alleged symptoms but Plaintiff's statements concerning the intensity of limiting effects were not totally credible.  The ALJ employed the Sixth Circuit's two-prong test followed in *Felisky v. Bowen,* 35 F. 3d 1027, 1038-1039 (6th Cir. 1994). First, he examined whether the objective medical evidence confirmed the severity of the alleged pain arising from the condition (Tr. 21-22).  Next, he examined whether the objectively established medical condition was of the severity that it could reasonably be expected to produce the alleged disabling pain (Tr. 22).  The Commissioner's decision is affirmed as the ALJ applied the correct legal standards and gave good and specific reasons for rejecting Plaintiff's testimony as it related to the severity of his impairments.

## CONCLUSION

For these reasons, the decision of the Commissioner is affirmed and the case is dismissed.

**IT IS SO ORDERED**.

/s/ Vernelis K. Armstrong
Vernelis K. Armstrong
United States Magistrate Judge

Date:   March 23, 2009

15